The Illinois Appellate Court's second division is now in session. The Honorable Justice Nathaniel R. Howard Jr. is presiding. Please be seated. Good morning, ladies and gentlemen. My name is Nathaniel House. I'm a judge of the Illinois Appellate Court. I'm presiding over this case with me are Justices David Ellis and Mary Midler. We're going to allow, we previously allowed, given the parties' notice, that we give them 20 minutes per side, and we've asked them to divide that up. Can you tell us how we're going to do that for the appellate? Yeah, I'm going to take 13 minutes and Mr. Tocco will answer. And your name, sir? I'm Mr. Hoppe. Okay, Mr. Hoppe. We're with the special prosecutor and Mr. Tocco. I'm Joel Tocco for Lee State's Attorney's Office. Thank you. And? Jeff Brines on behalf of the appellate Nicholas Trutenko. I've talked with counsel for Andrew Corbat, and I'm going to take the bulk of it. Okay. About 17 minutes or so, and then Mr. Harris is going to take the rest. Good morning. I'm Terry. I'm the last name spoken, K-L, and I represent Mr. Corbat, and I'll take whatever time is left. All right. Very well. Very well, then. If there are any questions we may proceed when you're ready. Okay. You can reserve some time for rebuttal. Five minutes. Thank you. I would like to reserve three minutes for rebuttal, if I may. Sure. Thank you. Good morning, Your Honors. May it please the Court, Rob Hoffman for the special prosecutor. Confidentiality is the heart of the attorney-client privilege. The privilege protects only communications made in confidence between clients and their attorneys under circumstances where the client has not given up any claim. To have the communication remain in confidence. The evidence suppressed by the trial court here, communications between Mr. Tritanko and Mr. Fangman, were never understood by anyone to be confidential. That is, they were never understood by anyone to be kept between Mr. Tritanko and Mr. Fangman only. Both of them experienced states' attorneys knew well from their experience working in that office that Mr. Fangman was obliged, obliged to share what Mr. Tritanko was telling him with his superiors. Now, I'm going to talk about two aspects of the privilege today. Both of them relate to this core issue of confidentiality. First is what I just began with, why the communications were not made in confidence in the first place. But second is also why the same basic idea viewed from the opposite end Mr. Bertocchi is going to be, to avoid repetition and to preserve time, Mr. Bertocchi is going to focus on the questions of formation of the attorney-client privilege, of any personal attorney-client relationship. And finally, I'm also going to address briefly at the end the alternative grounds for suppression in this case. But let me turn to the privilege issue. And of course, that's not official. If Your Honors want to hear anything from me or ask any questions, I'm more than happy to respond. So defendant's briefing offers nothing, nothing to satisfy their burden to prove that the communications here at issue were made in confidence. The trial courts really offers nothing to discuss or explain why communications were made in confidence. The closest anyone comes. Counsel, in some sense of the word, they're made in confidence, right? It's just a question of who gets to keep the confidence. Your position is the state's attorney's office is the client and they hold the privilege, right? No doubt. No doubt. But they could assert confidentiality. Yeah. And of course, the only confidentiality that you care about in this appeal is any confidence between Schutanko and Fangman personally. Right. Them and them alone. Once you admit, and in fact, their fallback position, as you may have noticed in the briefing, and at the trial court, their fallback position was whether it was a dual representation. But that's not a fallback safety position for them. That puts them in a corner from which they can't escape. Because if there's a dual representation, then under the decision in Janicek that we cite in our brief, there's no confidentiality in those communications unless there's a specific agreement between all the relevant parties. Would a dual representation be legal even? No. And that's the formation. That's one of the formation issues. And that echoes to both why I think it doesn't work. You can't get to a dual representation. But even if you could get to a dual representation, it would destroy the privilege here. Because you'd still need an agreement among all parties to maintain all the communications and confidence, which has clearly not happened. And by the way, Justice Smithbrook, part of the reason why we know, in addition to the absence of any evidence in the record of such agreement, part of the reason why we know that that wouldn't happen here is precisely because the State's Attorney, had they been told, oh, well, now there's a dual representation. Fang is representing Mr. Tritanko also in his individual capacity. There was no way. You can't do that. So of course they're not going to agree to a privilege under those circumstances. So it's all really a dead end. And Mr. Tritanko, by the way, never testified. So there's no evidence from Mr. Tritanko that he thought when he was speaking to Fangman, he was only speaking to Fangman. Of course, all the evidence. Well, is there any obligation in your view of Mr. Fangman's part to clarify to Mr. Tritanko that I am not representing you in a personal capacity and under the rules, there is generally some obligation to do that? I don't know whether there's an ethical obligation under these circumstances in particular because you're dealing with an experienced Cook County State's Attorney. He's made clear that he's representing him with respect to a subpoena that is addressed to the State's Attorney's office. So Fangman is quite – it's quite clear who Fangman's client is to everyone involved. Would it have been especially over-the-top belts and suspenders prudence to do so? In 2020 hindsight. With 2020 hindsight, I guess. But you're talking about the document subpoena. And the trial judge focused more on the witness subpoena. And that's not to the State's Attorney's office. That is to Nick Tritanko. That's true. But again, that doesn't change – it's not at all clear how that changes the nature of Mr. Fangman's representation. And Mr. Tritanko gets a separate lawyer, Mr. Horvat. And even in that window of time between the issuance of the subpoena and when he meets Horvat, there's still no evidence. Still no evidence. Because I don't think Mr. Tritanko actually would have understood that personal subpoena, that Mr. Fangman is now his personal lawyer and there's still no evidence that he believes when he's talking to Mr. Fangman. He's only talking to Mr. Fangman. None. And Mr. Tritanko, you would say, could have testified at this hearing without waiving his Fifth Amendment? Certainly. Judge Shaines could not have been clearer about this and bent over backwards to invite him to do that. So you would say that it was his burden and if he failed to testify, it would be one of the rare instances in a criminal case where his silence, his lack of production, could be used against him, held against him. I would not – so no, I don't actually think it's holding it against him. It's a failure of proof, but the reason why we win, Your Honor, is because the evidence is – the positive evidence that's in the record is to the contrary. We already have the evidence we need. The reason I point to his failure to testify is only because we didn't have the burden, but it's very clear, very clear, right? There are all kinds of communications between attorneys and clients that are, you know, not confidential. When you know one of those circumstances is exactly what happens here, when you know your attorney is going to talk to somebody else, and you have the handbook, you have the office policies, you have the fact that Mr. Tritanko is off and on for decades an experienced state's attorney. You have the fact that Mr. Fangman is clearly representing the state's attorney's office in the document subpoena and is working to try and figure out how – what position to take on behalf of the state in that. All of this is positive evidence that Mr. Tritanko couldn't possibly have believed. He was speaking only to Mr. Fangman and exclusively to Mr. Fangman. If he had some other belief based on some side conversations that the trial court here suggested could have happened or based on some misunderstanding when the personal subpoena comes in and you have a stray remark from Mr. Fangman saying, we will handle, we, we will handle. Well, of course, when a state's attorney is called to testify in a case in connection with his official duties, the state's attorney's office is going to pay attention. That's not – again, you're dealing with an experienced state's attorney. None of this is or should be surprising. So that's confidentiality, unless you have further questions. I want to just very quickly touch on waiver, which is the same point from the opposite side of the calendar. No later than June 2023 gets clear what's going on. Mr. Fangman's declaration has been submitted in the Wilson trial. They've actually moved to seal and to treat that as privilege in the Wilson case. It never gets ruled on because the case settles. The state's attorney's office needs to be involved. And they treat the issue as moot. But, of course, it's still sitting on the public docket. It's not moot if they're not intending to waive their privilege. That's exactly what the law, the law about promptness, acting promptly when you have notice, is exactly the same – it's driven by exactly the same principle that requires confidentiality on the front end. The client has to behave consistent with the expectation that this is an important piece of information that was shared between attorney and client. And waiting five months is bad enough. Put that aside. I think five months is too long. That's not prompt. But when you've actually asserted it in one form and you choose not to assert it in another, what else is the world supposed to believe other than you've walked away from the privilege? Or are you arguing more that you understand that you never had a privilege, which is why you don't assert it? Well, you could – that's, I think, the most natural reading of the evidence. But, of course, we only get to the waiver argument if you've assumed the existence of privilege. But you're right, Justice Mitbaugh. I think you could also treat the failure to act as confirmation that there was no expectation. Or circumstantial evidence. Right. It's a circumstantial confirmation that there's no expectation of confidentiality. By the way, another piece of – I wouldn't call it circumstantial. Really, I think, devastating fact, undisputed in this case, is that as soon as Mr. Frangman – I mean, as soon as Mr. Strutenko was relieved of his duties, he stopped communicating with Mr. Frangman at all. He communicated exclusively over his state's attorney's office email, and they stopped talking. I have no idea how that could be consistent with an expectation of either confidentiality or an understanding that this is my personal lawyer. But within the state's attorney's office, give him a lawyer right away. Sure, but that's also – if he thought Mr. Frangman is my personal lawyer, or even if he thought Mr. Frangman was my personal lawyer and now he's not anymore, at that point he's got to try to claw back all those communications that include emails, by the way, that are submitted in this case that were suppressed that actually have other people copy them. I mean, that's how far afield from the law this ruling is. On the alternative issues, Your Honor, with the – I want to just make sure to get touch on this. Why? I don't have an answer for you, Your Honor. I mean, I think Judge Shaines is obviously – when you read the transcript as a whole, and I'm trying to be fair here, he's struggling with what he thinks is a hard case and a hard question. There are difficulties, I think, downstream of the easy ways to dispose of this, like confidentiality is what I've been talking about in the waiver. But this – he really was struggling with what – two things. One, is there a difference between official capacity and personal capacity and how to define that? I don't think you need to get into all of that. That could be hard, and I'm not sure it's really hard in this case, but even so, he struggled with that. The other thing he struggled with was a lot of the issues in this case go to a question of mental state. That has to do with mental state of what the law required, and that's a difficult balance for him in his mind on what to take evidence on and what to draw legal conclusions on. And so a lot of the relevance, he's trying to sort out what he's supposed to be listening to or not. I think he's being overcautious there between us, and I think it's reached the point of overcautious to the point of an abuse of discretion. But – Could you address the cumulative misargument? Yeah. So I think the cumulative misargument – The cumulative misrulings. Yeah. I mean, what I would say about cumulative is this. We have a very heavy burden in this case. We have to prove that, you know, the charges are, you know, perjury, obstruction, and official misconduct as to Mr. Frangman, and then official misconduct as to Mr. Horvath. Right? These all require a mental state for us to demonstrate that not only did he take certain acts, but that they were inconsistent with his understandings, but that he knew full well what he was doing, and he knew full well the consequences of what he was doing. He understood all that, and the cumulative nature of it, the effort that Mr. Frangman undertook to try and figure out why those records were irrelevant, what's going on in the case, what's your relationship to the case, all of that goes to how much Mr. Frangman actually understood and knew at the time he made the false statements that are issued here, stretching all the way back to the conduct in 1989 when he – you know, the Brady material that's a significant part of the issues in the Wilson case that he concealed and continued to conceal all the way through to 2020. That's a hefty burden, Your Honor. And I know that Judge Sainz referred to the stipulation at the front. If you go look at that stipulation, I think it's at pages 332 to 334 of the report of proceedings. There's nothing in there that goes to this mental state. This is a full mental state issue. What about the September 27th Zoom witness probe, which is not privileged? That's not privileged, but that's also, again, that's a moment in time, and it doesn't quite show as weighty a fashion as the evidence that over time Mr. Frangman was able to reduce and Mr. Frangman could testify to that would reveal the extent of his knowledge and understanding at the time he was engaging in these acts for decades, quite frankly, in terms of the obstruction and the official respondent. I'll reserve the remainder of my time for a panel. Thank you. Thank you. You may proceed. Thank you. Good morning. May it please the Court. My name is Joel Bertocchi, and I represent the Cook County State's Attorney's Office, and I want to begin by thanking the Court for granting us leave to intervene and allowing us to brief the case and to speak to you today. I'm going to talk about formation of the attorney-client relationship and also the limitations of the State's Attorney Act. But before I do that, I want to touch on a couple of points that Mr. Hochman talked about. There was unquestionably confidentiality, but we owned the confidentiality. It was all done in official capacity, and so Mr. Tritanko may have had a thought that what he said to Mr. Frangman was going to be confidential within the State's Attorney's Office, but he could not expect that people above him or people above Mr. Frangman would not, might make a different decision and that he would be subject to that. Just to clarify, for the record, on behalf of the State's Attorney's Office, do you waive any privilege? We did. In fact, that's how the special prosecutor got this stuff from us, although a lot of it was made public in filings in the Wilson case already. But when we had a grand jury subpoena, Ms. Fox said, we're going to be transparent, we're going to give them everything between everything that we might otherwise claim privilege. So, yes, we don't assert any privilege. And to use the word you used before, clarify in a different way, whether we had an obligation to clarify, one of the things to keep in mind is that this is not a case where a layperson walks into a lawyer's office and says, and talks to him and says, I thought he was my lawyer even though he never said so. In fact, if you look at the Sims case, that's a case where the person might have believed that Kathleen Zellner was his lawyer because she went and talked to the prosecutor afterwards. Still not his lawyer. The other thing I wanted to mention before I get on to my main two issues is Justice Ellis made reference to the fact that, to a distinctive degree, the testimonial subpoena, the document subpoena and the testimonial subpoena. Well, remember what it is that happened. The first time Mr. Tritanko got a document where his name was on the top and not in the middle. And Mr. Tritanko as a 20-plus year assistant state attorney would have issued, what, about a million subpoenas in his time. He knows the difference between the top and the middle. And the first thing that happens when he finally gets a subpoena, still in a sufficient capacity, but it's got his name at the top, another lawyer is appointed. Mr. Horvath arrives. So if he was wondering if there was even any ambiguity in his mind about Mr. Fennigan before that, now he knows he's got his testimonial subpoena. Well, that wasn't the first thing that happened. Right. The first thing that happened was he called Fangman. Right. Fangman said that he would handle this, that he will file a motion to clause this. Right. I think he was using the royal we, really, like we the office will. Okay. But he could not have known at the time. And before anything else happened, Mr. Horvath was there pretty quickly. Pretty quickly was nine days, right? Well, before anything happened, yes. But not before he discussed the testimonial subpoena with Fangman at least once, right? Sure. And, again, there really is no distinction with Mr. Horvath either. It's all official capacity. It's all covered by the state's attorney. But certainly, ultimately, he ended up with a different lawyer for the subpoena that had his name at the top. Yes. And not the bottom. There are two issues I want to address in my more or less prepared part of the remarks. The first is the interline rule on formation of attorney-client privilege. You've looked at the Sims case. The Sims case makes it clear there are two aspects of it, neither of which are present in Judge Shane's essentially rule, essentially relying on the federal concept. One is agreement. But the second, which is just as important, is that it has to be manifest by both sides. It can't just be one of those conspiracy meeting of lines where nobody ever said it, but we both arrived at the same place at the same time. You have to have that agreement, but it must be manifest by both parties. The client must say, I want you to be my lawyer, and the lawyer must say, okay, I am your lawyer. And there is no evidence of anything like that. What Judge Shane's was relying on instead was a federal concept. And we spent a lot of time in our briefs talking about why the only cases that Mr. Tritenko relies on don't really make his point. But Sims is the Supreme Court of Illinois, and it says those things need to be there. And what Sims, the facts of Sims, the facts of those cases indicate is you can kind of dance around the edges, but that's not enough. Kathleen Zellner went to the prosecutors for the guy. Not enough. Why? No formalities. No formation of a relationship. We talked about all of those. Can you talk about what procedures and manuals and instructions are given to new state's attorneys? I thought I saw something in the record, but I couldn't find it. No, I don't know that that was ever gotten into you, Your Honor. And I think that — I mean, at some point when you become a new state's attorney, do they teach you, hey, you can't be a private lawyer for anything? No, they teach you. I mean, I think there actually at one time may have been counties where that happened, where it was a full-time job. But, yeah, they tell you that you can't be a private lawyer. They tell you that you have to follow the State's Attorney's Act and that the State's Attorney's Act only allows the state's attorney to represent county officers, including a guy down the hall, in his official capacity. And that is made clear. And, again, I want to go back to the fact that we're talking — Mr. Fangman's not talking to a sheriff's deputy or somebody who works at the assessor's office who may never have had legal training. He's talking to someone who's spent more time in the State's Attorney's Office than Mr. Fangman did. And he understands that. And not to mention the fact that he's a lawyer, and we're all charged with understanding the rules that apply to us. But the statute is particularly important. The State's Attorney's Statute only allows the state's attorney to defend county officers and county agencies. But county officers in their official capacity. What Judge Shames found Mr. Tritanko fought by himself, Mr. Fangman was doing, is illegal, as I think Justice McGurk mentioned earlier. It's not possible for Mr. Fangman to do that. Even if he had said to Mr. Tritanko, okay, I will be your personal lawyer, too, that would have been a violation of the statute and probably several office policies. And Mr. Tritanko, who worked there for years, would have known that. And so there really is, under that statute, everything that Mr. Fangman did with Mr. Tritanko related to the official capacity of the State's Attorney's Office dealing with the documents subpoenaed. But if he even had any conversations with him about the testimonials subpoenaed, it's all about Mr. Tritanko's work. It's all official capacity. And when it's official capacity, it's owned by the State's Attorney. Can you take a couple minutes to wrap up to save some rebuttal time? I will. I will. I know I have the hook. Fangman, I have the hook. Very nice of you. I've gotten worse. Mr. Hoffman. Good morning, Justices. Again, Brian Sexton on behalf of the appellee and Mr. Tritanko. Clearly, this is a highly unusual case. You've got two State's Attorneys that are defendants in this case. One is a criminal ASA and one is a civil ASA. And, in fact, Mr. Horvath only represented them for a few days. And now that the special prosecutor, their case is unraveling at trial. And now we're in a position here where an extremely rare mid-trial appeal. And the trial court – Is there something in the record that supports your suggestion that this all came about because their case was unraveling at trial? I guess that's not my understanding from the record of how this – Well, there is a ruling that went against them. I see. And that the trial court granted in their discretion. But, again, you're going to see a pattern in practice in this case that all the mistakes and all the adverse rulings, the special prosecutor believes it's everybody's fault but their own. And I believe that's what the record's going to show. I believe that's what the brief and argument show. But their argument is that the court should not have entertained the motion. Well, then they never objected to it in the first place. You can't engage in – consent to the hearing and then say, well, that's not fair that you ruled against us. They didn't object to the hearing at all. So they waived it. Yeah, exactly. So the trial court did find, and we would argue repeatedly, these are a unique set of facts and circumstances in this case. And based on the record before it, the trial court properly found an attorney-client relationship existed, as well as the fact that there was a waiver. Well, I mean, it is not unique or even unusual, is it, for the state's attorneys, particularly the civil division, I would guess, to represent government officials in their official capacity. No, not at all. That happens all the time. Not at all. But, again, this is a unique case where a civil ASA is representing a criminal ASA. It's happened many times before. And it's happened in this case that he also represented an individual capacity based on the evidence that Judge Shades heard. And I just want to point out a couple of glaring issues that we view, and the most is a jurisdictional issue. The special prosecutor never put in their notice of appeal a certificate of impairment, never discussed or never appealed the issue the evidentiary basis. After the ruling on attorney-client privilege and after the ruling that it wasn't rigged, he said, irrespective of that, after that ruling, it's not evidentiary basis to preclude it, that it was hearsay and it was cumulative and irrelevant. And that's not in the notice of appeal. But it's one order. It's one order that's being appealed, right? It's one order, but they need to specify which order. They can't decide all. They need to specify which order. The date of the order is specified in the notice of appeal. The date of the order is, but not the basis for the appeal. I believe the basis of the appeal is the attorney-client privilege and the waiver. Well, they said that in the notice of appeal, but all we require of the notice of appeal is that you appeal the proper order. The judge made a very, very long oral ruling, right? Yes. And then a very short written order that incorporated that by reference, incorporated all the evidentiary stuff as well as the privilege stuff, right? And then he said for all of these reasons, the defense wins, the special prosecutor loses, special prosecutor appealed that order. And they did put in there that one of the issues or the issue was attorney-client, but they didn't say that's the only thing we're appealing. Like, that was surplusage, wasn't it? I mean, is there a case that I'm not aware of that tells us to so strictly read a notice of appeal? Well, I believe the Ingray-Argiman case does tell them that they have to specify what they're appealing. But they specified the order itself. They got the order right, didn't they? It is the order, and that's part of the order, the evidentiary. Correct. And, Judge, Justice Ellis, I would also argue, though, it's cumulative. And the trial court specifically said special prosecutor Rosen testified about that September 27th Zoom meeting. So why are we having this brought forward, too? It's cumulative. It's irrelevant. It's already into evidence. So he made it clear that that was another basis why it should not come in. I would also point out that— But the order did cover. Yes. The appeal did cover those. Yes. What I would also argue is that there's a smoking gun on appeal. It is Jessica Scheller's affidavit. And I believe we'll refer to it as defense exhibit number 63. It's actually 61. But it hurts the state's attorney and the special prosecutor's case on appeal. And none of their exhibits are on file. And pursuant to Supreme Court Rule 321, the appellants responsible for any exhibit offered by any of the parties, they're responsible to bring before they have those exhibits. Yet they just ignore it because it doesn't help their position. They should be before you. And that's why you can consider it in the light most favorable to our client, to Nick. There's no response to that argument. There's nothing in the reply. Nothing. Why not? Why aren't these exhibits there? And, in fact, in the special prosecutor's response, when we made a motion to expedite this appeal, they said, well, in your proposed Supreme Court record, you don't have all the exhibits. All the exhibits have to be before the court. Well, they're not. And I don't know why. And especially in that exhibit because in one of the paragraphs it says, I did not inquire of A.S.A. Horvath into any privileged communications he had with Tritanko. Well, if the state's attorney's office is a client, why not? She recognizes that there's an individual basis, that there is an attorney-client privilege. And not only him. She didn't say that when she testified at the adventure. It's in the affidavit, though. It's in the evidence. Okay. She claims that the client is the state's attorney's office, but that is contradicted by her own statement in the declaration. That is in evidence. And that's contradictory to Joe Magatz. Joe Magatz testified. The court heard all the evidence at the trial. He said Paul Feigman had an attorney-client relationship with Nick. And, in fact, Jessica Scheller, the special prosecutor, even Feigman, they all say that Andrew Horvath and Nick Tritanko had an attorney-client privilege. They admitted that before the hearing. Even the state's attorney was present at that time. And didn't object to the fact that Andrew had an attorney-client privilege with Nick. And the question that the judge kept asking is, well, what's the difference between Paul Feigman and Andrew Horvath? Well, I kid you not. He's representing him on the testimonial subpoena, as Justice Ellis pointed out. For nine or ten days, Paul Feigman was representing him on the testimonial subpoena. That goes to him personally as a witness. And we had that e-mail on September 15th. He asked Paul Feigman, please advise. Feigman's telling him, hey, don't even contact the other attorney. I'm going to handle this. He handles it for about nine days. Counsel, I don't think anybody is disputing that in some sense of the word that these attorneys were representing these individuals. But they were representing them in their official capacity. Yes, they were playing the lawyer. They were the lawyer. Feigman was the lawyer dealing with the, well, certainly with the document subpoena. There's no dispute about that. I think your colleagues on the other side might dispute whether he ever actually became the attorney on the testimonial subpoena. But even if he did, it doesn't automatically follow that he was representing him in his personal capacity. I mean, you have to have a lawyer representing the office, and you have to talk to the people who will know something about the subpoena or have to be responsive to the subpoena who are part of that office. I mean, the office is not something you can touch, right? It's the people who work for it. But if they're working in their official capacity and you're representing them in that official capacity, yes, you're representing them. That's not really a question. And it might even, depending on how you view it, be viewed as privileged. But the question is who holds the privilege, right? I mean, your position is that Nick Tritanko held the privilege. Yes. That he could have told Feigman you can waive it or not. And as long as I tell you, Paul Feigman, don't tell this to anybody, not even your boss, he would have to respect that. I don't believe that, Judge. If you look at it objectively, you can consent impliedly. You can consent it could be inferred as well. Paul Feigman never told Nick, hey, I don't represent you individually. I don't represent you at all. And, in fact, I asked him across. So if Kim Box wants to tell Wobie Nobie everything that you said in confidence, that's okay. He said, sure. That doesn't even make sense. He actually, Paul Feigman, by giving it to him. Why doesn't that make sense? Again, I believe that because it's said in confidence, and I believe he represented them individually as well as the officers. So is it your position that if Mr. Tritanko told Mr. Feigman not to tell anybody else in the State's Attorney's Office anything that was said, that would be appropriate? No. And that was his expectation that it wouldn't be reported to anybody beyond Feigman. No, I don't think he had that expectation. But he had the expectation that he did have a privilege with Paul Feigman. Paul Feigman never said, I am not your personal attorney. I think he's got some kind of duty to tell him that. Never said anything like that whatsoever. And I believe that the evidence that the court heard is that Nick subjectively and reasonably believed that Paul Feigman was his attorney. There's no requirement that Nick had to testify, especially when we did get into the October 1st trial where he said, those are my two attorneys right there. And they were representing him on the testimonials. Well, sure, they were representing him. I mean, what capacity? So you think that when Tritanko was talking to Feigman that he reasonably believed that whatever he said to Feigman would not go up the chain at the State's Attorney's Office? Between that, yes. That's saying the same thing. Okay. And I believe that. So what kind of a policy would that be? I mean, if you've got a government attorney talking to another government attorney, and hypothetically, I'm not at all saying this out, but let's just lay my argument out hypothetically. I'm really not saying this actually happened. But let's say your client said, one government attorney said to another, I've been withholding evidence. I have been, I know where this witness is, and I'm just not telling anybody because he's my friend. I've been hiding evidence. I've been concealing stuff. I suborned perjury. I did all these things. Now don't tell anyone. And you think the law would say that one government lawyer can shield another government lawyer? No, I don't believe that. Then how is that not what you're saying? Well, I believe that in that situation you're talking about something like a crime fraud exception. No, we'll talk about past stuff. I believe that if he said, well, I believe there is case law to that effect. You're right. But that's not the whole thing we're talking about here, isn't it? The government, if you're representing someone in your official capacity, you don't protect them for personal liability. You can get a lawyer who will do that, and you can confess all your sins to that person, and they won't tell us as long as you're not committing a future crime, right? But government to government, is that, what the, is that, are you aware of any case that has said that two government lawyers can keep each other's secrets? No, I'm not aware of a case like that. But I believe that you can have implied consent to an attorney-client relationship and also try to represent the state's attorney's office. I believe there's a case law that says, there's no case law against that. It just, again, depends on the circumstances. So are you talking about dual representation? Yes. Dual representation? Yes. That he had a subjective belief that his lawyers were representing the state? Yes, it was reasonable, and Paul Feynman's actions, viewed objectively, showed that he consented to that. Is there any evidence in the record that Feynman told Cherchenko that he's going to hold everything in confidence? No. No, but he repeatedly talked to him and basically said, don't talk to the other side, I'm going to, please advise, is what Nick said, and that's what Feynman did. Could your client have testified in support of this motion to suppress, or whatever we're calling it, right? Right. Without waiving his Fifth Amendment rights? He could have, but we believe the evidence showed through the e-mails and through his testimony came in, through the October 1st transcript, where he said in his words, we ought to just belabor the point where clearly, based on the e-mails and based upon Scheller's declaration and based upon the evidence that came in, that he reasonably believed that that was his attorney. I don't think it's fatal to an attorney-client relationship. But Feynman testified that he never considered himself personal counsel for Cherchenko, and he never told him he was. So I would argue that his conduct contradicted that. His conduct, viewed objectively, shows that he did consent to be his attorney. And that's what Judge James ruled. And I don't think that's against the manifesto weight of the evidence. Just a couple other things. Regarding the handbook, yeah, ASAs can't engage in private practice. It has no bearing on this case whatsoever. Actually, what Judge James said, I think, was it's a false dichotomy, this personal versus official capacity. Can you explain that? I think he said basically you can still have an individual, you can still represent, you can still create this attorney-client privilege to him personally because it was a testimonial subpoena as well. The only thing I would add is that the state's attorney's office says, well, it's going to be difficult to defeat. They're doing it now. All he had to say was, we don't represent you individually. That's all they had to do. And they didn't do it in this case. Can you tell us about the waiver issue that's been raised? Yes. Regarding the waiver issue, first of all, it's a special prosecutor's burden. It's not our burden. It's our burden to show that there was an attorney-client relationship, which Judge James found. But it's on them to show that the privilege should be overcome and that it was waived. There's no case law that says, well, it's got to be immediately right away or else it's out. This whole clawback notion, these are oral statements. I don't know what we're clawing back. They never were in the hearing. They were never discussed in the hearing. And I think Judge James was in a unique position because, in this case, he knew about a discovery issue that we had. The special prosecutor was saying, well, you knew about it in June of 2003. They gave us 300,000 documents, all individually scanned and untitled. And he was aware of that issue, that we're trying to go through this as best we can. We also made motions. We joined in Mr. Horvath's motion to stop having a special prosecutor testify. What are the statements you're going to use? What are the defendant's statements that you're going to use? And, you know what, they basically told us, well, it's a discovery. Go find it. I mean, that's not what a prosecutor's duty is. They never identified it. They made a motion to eliminate, and that's 394, 396 in the record, summarizing Langley's testimony. Never put in there the dates or the statements that he supposedly made the defendant. How is Nick supposed to know it if they don't even identify it? And, again, he said there was a pox on both houses. We argued it in the opening statement, but maybe we could have made a motion. But the state could have made a motion to eliminate, could have made it clear the statements that they were going to use. The evidence showed that Nick didn't intentionally waive anything. And not only that, but not until the hearing actually began did we find out the dates that he supposedly talked to the defendant, the 11th, 14th, 15th, 21st. Those dates aren't in the declaration. Those dates aren't in the motion to eliminate. Again, there's nothing to claw back because these are oral statements that were made, and they have not been presented in the public court at the hearing yet already. I would just argue, just to wrap up, and I know I'm getting near the end because I want to give my co-counsel a little bit of time, but there's no evidence that was ever waived at all. Each case is different. Based on unique facts, civil liaisons have been representing criminal liaisons for a long time. And I think just because it's not waived, the evidence has shown that it's not against the manifest weight of the evidence. Judge Shane's ruling, he questioned the witnesses himself. And it's not so arbitrary or capricious that they need to overturn it. And I would also, just briefly regarding waiver as well, they're trying to, special prosecutors are trying to introduce new evidence that they didn't have at the hearing. This whole thing on June 16th in a federal civil case, they're trying to get rid of it, go around the Sylvester v. Chicago partners and try to introduce evidence for the first time on appeal. And this is not a de novo review. They can't do that. And based on the arguments they made at the trial level, and for that reason we ask that you deny it. There we go. Thank you. Mr. Sixman. Good afternoon. Good afternoon. Nice to see you. Nice to see you guys. After reading the briefs in this case, you must be sitting here thinking, why is Andrew Horovath part of this appeal? Judge Shane's ruling had nothing to do with the case against Andrew Horovath. Horovath, as you know, is an assistant state's attorney in the civil division. He was assigned to represent Cherchenko. His initial involvement in this case was on September 27th. The statements that were suppressed took place between the 15th and the 25th of September. He was not present for any of those conversations. He had no involvement whatsoever. When the prosecution sought to admit those statements, Mr. Cherchenko's attorneys objected. Horovath did not. Judge Shane's conducted a Rule 104 hearing. Horovath did not participate in any way, didn't ask any questions, made no arguments. It wasn't his issue because this evidence was not admissible against him. Judge Shane specifically confirmed prior to commencing the 104 hearing whether this prosecution, this issue involved Horovath, and both parties agreed. That's at the record, page 1041. Judge Shane's issued an order suppressing statements between the 15th and the 25th. They had nothing to do whatsoever with Horovath. You'll notice in the notice of appeal there's no mention of Horovath. The prosecution in their opening brief in this case claimed that Cherchenko and Horovath informed the state that they planned to object to testimony from Fangman. That's a false assertion. Horovath never took any position whatsoever in regard to these statements. Likewise, throughout their brief, they tried to add the defendants objecting and the defendants doing multiple things. That's not accurate. And most importantly, we're here because of a false and fraudulent certificate of impairment. Prosecution alleged to this body that this evidence substantially impaired their prosecution of Andrew Horovath. That is simply not true because this evidence had no impact whatsoever. This was a blatantly false statement. Your Honors. Just to clarify, so is it your understanding now that they do intend to use it against your client? No, they can't. They can't, Your Honor. All right. There's no exception to any hearsay rule. There's no possible co-conspirator statement. It all happened before he got arrested in the case. Okay. That all makes sense. Yeah. So it has nothing to do with him. And the question is, why was Horovath drug into this appeal? Why was he not permitted to continue his case when this ruling was made? We repeatedly demanded trial. Prosecution files this certificate of impairment, which, of course, along with a notice of appeal, divested the Circuit Court of Jurisdiction. There was nothing we could do other than be a part of this appeal. That's wrong. That's not proper. And it has substantially impacted Mr. Horovath's life to have this matter hanging out for months and months. So you're basically saying your speedy trial rights are being violated. Yeah. They're dragging it along because they want to try the cases together. You got it. You're right on my money. I don't know what we can do about that. I did something in this case that I'd never done in my life. I demanded trial off a rating because I knew the case was baseless. We started trial on day 157, I believe. Okay. Now with the appeal, his speedy trial is told. However, if your honor has determined that that certificate of impairment was improper, false, fraudulent, I will have an argument that he's entitled to have this case dismissed in the trial court for a violation of speedy trial. I think you'd have to file a motion of some kind to get us to even consider such a thing, I think. Is that what you want from us? No. I'm asking you to rule as part of your decision in this case that the certificate of impairment against Horvath was false and fraudulent and there was no basis of this appeal. Counsel, I grant you that the discussions that are at issue precede Horvath's involvement, but you think that that has no bearing on the outcome of your client's trial? Absolutely not. So there's no argument to be made that if the state is unable to prove their case against Cherchenko, that would help, that would be a good thing for you, that that would not build on, that would not be to your benefit? I don't think the content of the statements that were suppressed, if they were to go into evidence or not go into evidence, will materially impact either the case against Cherchenko and certainly not the case against Horvath. So these statements are basically meaningless. So what was the state supposed to do here if they filed the certificate of impairment to your liking and said, no, not Horvath, but definitely Cherchenko is involved and this will substantially impair our prosecution of Cherchenko when you're trying the case jointly? What would you say should happen? Separate the trial? No, you don't need to because this was two separate indictments. And we agreed to try the case jointly because it was a bench trial for judicial autonomy. It just made sense. There was nothing to sever. We simply could have continued with the case against Horvath. There wouldn't have been any requirement to sever anything. It was one indictment, but it was two separate cases. So the case against Horvath could have proceeded independent of the appeal of the Cherchenko case. And that's what we requested in the trial court and, of course, could not do that because of the notice of appeal and certificate of impairment. And the court, as you know, is not in favor of the case against Horvath. It is in favor of the case against Cherchenko claiming that the issue before your honors materially impacted the case against Horvath, and that's false. Is it and I have not looked at the certificate of impairment in this light at all, but is it not an appropriate part of the certificate of impairment that they want to try the cases to continue to try the cases together since they're halfway in? Is that not a legitimate consideration? No, it isn't. It's got to substantially impair the case against Horvath. Okay. The fact that this joint trial consolidated for trial should have no impact whatsoever. Okay. Thank you very much for your time today. Thank you. And you never filed a brief, so this is the first we're hearing of your concerns. We filed one joint brief. Right. You didn't file a separate brief. You have not alerted us to this issue prior to today. I believe it's in our pleadings, in our brief, the fact that the certificate of impairment was filed against Horvath. Improperly. Improperly. Thank you. All right. All right. Excuse me. I have one thing. We also filed a motion to dismiss on this issue, so the court was well aware of our position. Thank you. All right. Ms. Hoffman. I have just four points. Hopefully I can make them very quickly, Your Honors. First, I don't want to get into the details of some of the more recent discussion, but I do want to point out that I believe I heard Mr. Saxon say that at no time is there any reason to believe that Mr. Chutanko was speaking to Mr. Fangman and not expecting Mr. Fangman to pass that information along to his superiors. I think he conceded that here. I think he said it. And then he retreated to the joint representation argument, which I've already dealt with. I think that's the end of the matter on privilege. You can stop there. You don't have to get into anything else. You don't have to get into any official capacity, personal capacity. You don't have to get into the formation of an attorney-client relationship. Attorneys and clients can talk to each other under circumstances not protected by the privilege.  So that's the end of that issue, in my opinion. Very quickly on Mr. Horvath. Mr. Horvath, as Your Honor said, Justice Ellis, Mr. Horvath is charged with basically participating in significant official misconduct that was begun by Mr. Chutanko. The idea that it's not germane how clear it is that Mr. Chutanko committed those illegal acts and that Mr. Horvath sought to advance is absurd. It's very clearly and directly relevant. It is absolutely not just relevant but critical to our case, which is exactly why it's in the Certificate of Impairment, which is exactly why, among other reasons why, this came up together. I don't think you consent to a joint trial and then you get to flip the switch off when it becomes inconvenient. I don't think there's any law that says that. And I don't think that there's any reason why this Court should be the first to do that. On the question of the cumulative nature of the ruling, very quickly, Your Honor, these issues go directly to the hearts, to the heart of the issues in the indictment. This is about Mr. Chutanko's specific knowledge of what he was doing, how it was disrupting the administration of justice for decades, for decades. And the fact that he had one conversation with one person, we haven't even had. He dismissed this cumulative testimony. He hasn't even heard it, Your Honor. And so that's a problem. And then finally, just quickly, on the jurisdictional issue, it's not only that the order, that there's a single word, that's clear, but that's not the only thing we said in the Notice of Appeal. We asked for specific relief. We asked for the admission of the evidence, the admission of the evidence. That's what we seek. We seek the right to put on our case, and under any, even a squirrel, which is not the law, interpretation of the Notice of Appeal. It's clearly before Your Honors. Unless there are no further questions, Your Honor, we respectfully request that you reverse the order and enter an order allowing us to admit the evidence. Thank you very much. The case was well-argued, well-briefed. Both sides were well-prepared, and we appreciate that. We'll take the case under advisement and issue a decision in due course. Thank you.